# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

TRACEY LALL,

       Plaintiff-Appellant,

vs.

Corner Investment Company (d/b/a The Cromwell Hotel and Casino), *et al.*,

       Defendants-Respondents

**No. 23-15489**

On Appeal from the United States District Court of Nevada

CIVIL CASE NO.:

2:20-cv-01287-CDS-NJK

The Honorable Christina D. Silva

## **APPELLANT'S OPENING BRIEF**

MCAVOY AMAYA & REVERO ATTORNEYS
MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
600 S. 8th Street
Las Vegas, Nevada 89101
Telephone: (702) 299-5083
Mike@mrlawlv.com
*Attorney for Plaintiff/Appellant*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES...............................................i-vi

STATEMENT OF JURISDICTION.....................................1

STATEMENT OF ISSUES...............................................1

STATEMENT OF THE CASE.........................................1-3

SUMMARY OF THE ARGUMENT...................................3

ARGUMENT.................................................................3

    **I.    THE DISTRCIT COURT ERRED BY APPLYING THE WRONG LEGAL STANDARDS, IMPROPERLY WEIGHED THE EVIDENCE, AND WHOLLY IGNORED THE SUBSTANTIAL EVIDENCE TRACEY PRESENTED TO ESTABLILSH PRETEXT OF DISCRIMINATION**....3-47

    **II.    **THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO CONSIDER APPELLANT'S COVID-19 TOLLING ARGUMENTS. ..........................................47-54

    **III.    <u>THE DISTRICT COURT CLEARLY ERRED WHEN GRANTING SUMMARY JUDGMENT TO LOCAL 165 AND THE CROMWELL ON THE HYBRID LMRA §301 DUTY OF FAIR REPRESENTATION CLAIM BECAUSE LOCAL 165 BREACHED ITS DUTY OF FAIR REPRESENTATION EXCUSING ANY FAILURE TO EXHAUST CONTRACTUAL REMEDIES.</u>**................................54-65

    **IV.    **THE DISTRICT COURT CLEARLY ERRED WHEN GRANTING SUMMARY JUDGMENT ON THE §301 CLAIM BECAUSE THERE WAS SUBSTANTIAL EVIDENCE THAT THE CROMWELL BREACHED THE CBA WHEN DISCIPLINING TRACEY.............................................65-69

i

CONCLUSION…………………………………………………….70

STATEMENT OF RELATED CASES……………………………….62

CERTIFICATE OF COMPLIANCE………………………………….63

CERTIFICATE OF SERVICE………………………………………64

## <u>TABLE OF AUTHORITIES</u>

**Statutes**

28 U.S.C. 1331...............................................................................1

28 U.S.C. 1441...............................................................................1

**United States Supreme Court Cases**

*AMTRAK v. Morgan*, 536 U.S. 101, 104 (2002)................................51

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).....................3, 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...........................................46

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)........................46

*Boechler, P.C. v. Commissioner*, 142 S. Ct. 1493 (2022)....................51

*DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151 (1983)................54

*Fort Bend Cty. v. Davis*, 139 S. Ct. 1843 (2019)...........................51, 52

*Int'l Union of Elec. v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976).......52

*Tolan v. Cotton*, 572 U.S. 650, 657 (2014)......................................5

*Vaca v. Sipes*, 386 U.S. 171 (1967)............................................54, 55

**United States Court of Appeals Cases**

*Ackerman v. W. Elec. Co.*, 860 F.2d 1514 (9th Cir. 1988)...................45

*Albi v. St. & Smith Publ'ns, Inc.*, 140 F.2d 310 (9th Cir. 1944)............47

*Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698 (7th Cir. 2012).....12

*Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846 (9th Cir. 2012)..................49

*Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983)....................4

*Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566 (6th Cir. 2014)...............42

*Bell v. Clackamas Cnty.*, 341 F.3d 858 (9th Cir. 2003)....................7, 16

*Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136 (9th Cir. 2001).........................................................6, 17

*Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21 (1st Cir. 1998)............39

*Carr v. Pac. Mar. Ass'n*, 904 F.2d 1313 (9th Cir. 1990).....................55

*Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201 (9th Cir. 2008)..........4

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022)..................66

*Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151 (9th Cir. 2010)..........5, 25

*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128 (9th Cir. 2001)..........7

*Jackson v. S. Cal. Gas Co.*, 881 F.2d 638 (9th Cir. 1989)....................54

*J LBev. Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098 (9th Cir. 2016) ..............................................................................................................4

*Lake v. Yellow Transp., Inc.*, 596 F.3d 871 (8th Cir. 2010)..................17

*Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172 (9th Cir. 1999)........................................................................................................52

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019)............7, 26

*Lippi v. City Bank*, 955 F.2d 599 (9th Cir. 1992)................................4

*Nickler v. Clark Cty.*, 802 Fed. Appx. 262, 2020 WL 710229, at *1 (9th Cir., 2020).............................................................................................52

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885 (9th Cir. 2005)..................27

*Powell v. Rasmussen*, Nos. 22-35361, 22-35362, 2023 U.S. App. LEXIS 23094, at *2-3 (9th Cir. Aug. 31, 2023).............................................9

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996).............................47

*Rincon v. Am. Fed'n of State*, 638 F. App'x 631 (9th Cir. 2016)........7, 12

*Rodríguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40 (1st Cir. 2019) ...................................................................................39

*Silverman v. Bd. of Educ.*, 637 F.3d 729 (7th Cir. 2011).....................6

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011)..........6

*Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097 (9th Cir. 2008).............5

*Zeinali v. Raytheon Co.*, 636 F.3d 544 (9th Cir. 2011)........................5

*Timmons v. General Motors Corp.*, 469 F.3d 1122 (7th Cir. 2006)........26

*Turner v. Phillips 66 Co.*, 791 F. App'x 699 (10th Cir. 2019)..............42

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160 (9th Cir. 2012)...................................................................49

*Vasquez v. Cty. of L.A.*, 349 F.3d 634 (9th Cir. 2003).....................8, 25

*Zeinali v. Raytheon Co.*, 636 F.3d 544 (9th Cir. 2011).........................5

**Federal District Court Cases**

*Anderson v. Wis. Gas Co.*, 619 F. Supp. 635 (E.D. Wis. 1985).............52

*Budwig v. Allegiant Air, LLC*, No. 1:18-cv-01068-EPG, 2020 U.S. Dist. LEXIS 160481, at *31 (E.D. Cal. Sep. 2, 2020)................................11

*Debeikes v. Hawaiian Airlines, Inc.*, 141 F. Supp. 3d 1075 (D. Haw. 2015)....................................................................................55

*EEOC v. Grane Healthcare Co.*, No. 3:10-250, 2015 U.S. Dist. LEXIS 123133, at *141 (W.D. Pa. Sep. 15, 2015).......................................42

*Hamed v. Macy's W. Stores, Inc.*, 2011 U.S. Dist. LEXIS 48568, at *50 (N.D. Cal. Apr. 29, 2011).............................................................6

*Jay v. SEIU-UHCWW*, 2017 WL 697110 at *2-4 (N.D. Cal. Feb. 22, 2017)...............................................................................57, 67

*ML Liquidating Tr. v. Mayer Hoffman McCann P.C.*, No. 2:10-cv-02019-RRB, 2011 U.S. Dist. LEXIS 157070, at *4 (D. Ariz. Mar. 11, 2011) ......................................................................47

*Payne v. Shinn*, No. CV-20-0459-TUC-JAS, 2021 U.S. Dist. LEXIS 150082, at *9 (D. Ariz. Aug. 10, 2021)...........................................52

*Quaranta v. Mgmt. Support*, 255 F. Supp. 2d 1040 (D. Ariz. 2003)......17

*Rimes v. Claire's Stores, Inc.*, 2023 U.S. Dist. LEXIS 21652, at *13 (C.D. Cal. Jan. 6, 2023)..................................................................6

*Roberts v. Clark Cty. Sch. Dist.*, No. 2:15-cv-00388-JAD-PAL, 2016 U.S. Dist. LEXIS 163800, at *4 (D. Nev. Nov. 28, 2016)...........................52

*Sams v. City of Chi.*, No. 13 CV 7625, 2014 U.S. Dist. LEXIS 164886, at *20 (N.D. Ill. Nov. 25, 2014)............................................................27

*Sterling Transit Co. v. Fair Employment Practice Comm'n*, 121 Cal. App. 3d 791, 175 Cal. Rptr. 548 (1981)...........................................45

## STATEMENT OF JURISDICTION

The District Court ("DC") had jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1441(a).

## STATEMENT OF THE ISSUES

**THE DISTRCIT COURT ERRED BY APPLYING THE WRONG LEGAL STANDARDS, IMPROPERLY WEIGHED THE EVIDENCE, AND WHOLLY IGNORED THE SUBSTANTIAL EVIDENCE TRACEY PRESENTED TO ESTABLILSH PRETEXT OF DISCRIMINATION.**

**THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO CONSIDER APPELLANT'S COVID-19 TOLLING ARGUMENTS.**

**THE DISTRICT COURT CLEARLY ERRED WHEN GRANTING SUMMARY JUDGMENT TO LOCAL 165 AND THE CROMWELL ON THE HYBRID LMRA §301 DUTY OF FAIR REPRESENTATION CLAIM BECAUSE LOCAL 165 BREACHED ITS DUTY OF FAIR REPRESENTATION EXCUSING ANY FAILURE TO EXHAUST CONTRACTUAL REMEDIES.**

**THE DISTRICT COURT CLEARLY ERRED WHEN GRANTING SUMMARY JUDGMENT ON THE §301 CLAIM BECAUSE THERE WAS SUBSTANTIAL EVIDENCE THAT THE CROMWELL BREACHED THE CBA WHEN DISCIPLINING TRACEY.**

## STATEMENT OF THE CASE

This matter arose out of alleged breaches of a collective bargaining agreement ("CBA") between the Unite Here Local 165 ("Local 165") and The Cromwell Hotel and Casino (the "Cromwell"), and disability

1

discrimination by the Cromwell against Tracey Lall. Tracey had breast cancer and her treatment caused her to develop dystonia, a seizure/tremor condition.

Tracey alleged that Cromwell began discriminating against her for her cancer and dystonia medical condition. Cromwell engaged in a pattern of discriminatory conduct. Cromwell subjected Tracey to a variety of adverse employment actions because of her disability, including a drug test because she had a tremor at work, refusing to provide her reasonable accommodations, and forced her on leaves of absence when her condition would cause a tremor/seizure at work. Between May 10, 2019 and December 18, 2019, Cromwell issued Tracey eight (8) disciplines and terminated her employment for progressive discipline on January 11, 2020. Prior to May 10, 2019, Tracey had just four (4) disciplines in the prior five (5) of her employment.

Tracey's union, Unite Here Local 165, breached its duty of fair representation by failing to investigate Plaintiff's claims and file grievances challenging her live discipline after requesting the union challenge her progressive discipline termination. Local 165 also failed to enforce the CBA when processing her termination grievance. The

Cromwell breached the CBA with impunity when it terminated Tracey without just cause.

## SUMMARY OF THE ARGUMENT

The District Court committed several critical errors of fact and law when granting summary judgment in favor of Defendants and failure to apply correct legal standards. The District Court improperly weighed the evidence, and failed to view the evidence in the light most favorable to Tracey when granting Defendants summary judgment. The District Court abused its discretion when it refused to consider Tracey's argument regarding equitable tolling due to the COVID-19 pandemic. The District Court failed to address Tracey's argument that exhaustion of contractual remedies was excused because a recognized exception to the exhaustion requirement applied.

## ARGUMENT

**I.    THE DISTRCIT COURT ERRED BY APPLYING THE WRONG LEGAL STANDARDS, IMPROPERLY WEIGHED THE EVIDENCE, AND WHOLLY IGNORED THE SUBSTANTIAL EVIDENCE TRACEY PRESENTED TO ESTABLILSH PRETEXT OF DISCRIMINATION.**

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

3

law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *Id*.; *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983).

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Lippi v. City Bank*, 955 F.2d 599, 613 (9th Cir. 1992). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255; *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). This Court reviews a District Court's granting of "summary judgment de novo." *J LBev. Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1104 (9th Cir. 2016). The Court reviews "the District Court's conclusions of law de novo, and its factual findings for clear error." *Id*. "[W]here it is unclear whether the District Court relied on proper law, we may vacate the judgment and remand with instructions to apply the correct legal standard." *Id*. When a Court fails "to credit evidence that contradict[s] some of its key factual conclusions," the court is considered to have

"improperly 'weigh[ed] the evidence" and resolved disputed issues in favor of the moving party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

This Court analyzes employment discrimination claims arising under Title VII, NRS 613, and § 1981 within the *McDonnell-Douglas* burden-shifting framework. *See Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008). A claimant must first establish prima facie case of discrimination, which "requires only minimal proof and does not even need to rise to the level of a preponderance of the evidence." *Palmer v. Pioneer Assocs., Ltd.*, 338 F.3d 981, 984 (9th Cir. 2003).

To establish a prima facie case of discrimination a plaintiff must present evidence showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) that similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See Zeinali v. Raytheon Co.*, 636 F.3d 544, 552 (9th Cir. 2011). Once a prima facie case is established the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d

1151, 1155 (9th Cir. 2010). Once met, the plaintiff must raise a triable issue of material fact that the reason offered by the employer was a pretext for discrimination. *Id.*

"To avoid summary judgment…the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision." *See Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) *citing Silverman*, 637 F.3d at 733. "Only a small amount of direct evidence is necessary in order to create a genuine issue of material fact as to pretext." *See Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Id.*

"Direct evidence includes comments that demonstrate discriminatory animus and a causal relationship between those comments and the adverse employment action." *Rimes v. Claire's Stores, Inc.*, 2023 U.S. Dist. LEXIS 21652, at *13 (C.D. Cal. Jan. 6, 2023). Discriminatory comments and adverse employment decisions made

6

about a plaintiff's medical condition is direct evidence. *Hamed v. Macy's W. Stores, Inc.*, 2011 U.S. Dist. LEXIS 48568, at *50 (N.D. Cal. Apr. 29, 2011).

"A 'convincing mosaic' [of circumstantial evidence] may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *See Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). This Court has found that "[t]emporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003); *Rincon v. Am. Fed'n of State*, 638 F. App'x 631, 633 (9th Cir. 2016). "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001). A plaintiff that presents

evidence that the employer "treated similarly situated employees outside [the plaintiff's] protected class more favorably would be probative of pretext." *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003).

### 1. *Tracey Presented Pretext Evidence That Her Termination Was In Temporal Proximity To Her Last Request For Reasonable Accommodations, A Protected Activity.*

The District Court found Tracey established a prima facie case of discrimination, that the Cromwell had met its burden to show a non-discriminatory reason for her termination, and granted the Cromwell summary judgment because Tracey "fails to meet her burden to show with specific, substantial evidence that The Cromwell's proffered reason for terminating her was pretextual." *See* 1-LALL-ER-008. The District Court proceeds to assert that "Lall insists that the defendants terminated her as retaliation for her seeking accommodations. But she fails to show that she sought accommodations, other than the one-time request she made to her supervisor in 2015 or 2016—four to five years before her termination—to use the guest restroom instead of the employee restroom." *Id.*

This factual conclusion by the District Court was demonstrably false, and is a clear error of fact that warrants reversal of summary judgment. *Powell v. Rasmussen*, Nos. 22-35361, 22-35362, 2023 U.S. App. LEXIS 23094, at *2-3 (9th Cir. Aug. 31, 2023). On November 21, 2019, within one month of Appellant's suspension on December 18, 2019, and less than two months before her termination on January 11, 2020, the Cromwell Defendants sent Tracey a formal ADA accommodations denial letter. *See* 4-LALL-ER-596.

Tracey deposed the Cromwell's 30(b)(6) Human Resources ("HR") witness, Ashley Mazzone, regarding the company's policies for medical certifications and matters related to Tracey's requests for reasonable accommodations. *See* 3-LALL-ER-501-506. According to the 30(b)(6) witness once an employee certifies their medical condition "We don't dispute their medical conditions." *See* 3-LALL-ER-501-502. According to Mazzone, the Cromwell's "ADA packet does ask for pretty much the same information as the FMLA certification." *Id*. The witness expressly acknowledged that Tracey certified her medical condition when she requested FLMA leave repeatedly in 2018 and 2019. *See* 3-LALL-ER-501-502, 506. Tracey's cancer and dystonia seizure condition were known to

the Cromwell for years before the November 2019 request. *See* 5-LALL-ER-855-857. Mazzone was questioned about the November 21, 2019 letter at her deposition, noting that

> A *This document is something that we would send out if we had a team member who put in a <u>request for an ADA leave or an ADA accommodation</u>,* and we never heard back from them or never received their paperwork back. We would typically also try to call them, but we would send this letter to them as well informing them that we did not receive any supporting documentation.
>
> Q Okay. *So Tracey did make an ADA request then? Is that what your testimony is?*
> A *Correct.*
> Q Okay. *And she had certified her medical condition for FMLA leave several times prior to this?*
> A *She did.*
> Q Did Tracey ever request the ability to have a seizure at work, you know, in the bathroom, *based on the documents you reviewed in preparation for this deposition*?
> A *She -- my understanding is she made that request to her managers, but I don't believe we received a medical certification for an ADA accommodation.*

*See* 3-LALL-ER-506(emphasis added).

Tracey's argument in her opposition to the Cromwell's motion for summary judgment ("MSJ") cited to the November 21, 2019 ADA denial letter, and Mazzone's 30(b)(6) deposition testimony when arguing that Tracey requested reasonable accommodations on October 23, 2019 right before she was terminated. *See* 2-LALL-ER-317-318. The District Court's

10

conclusion that Tracey did not present evidence that she requested accommodations is clearly erroneous and warrants reversal of summary judgment.

The District Court's conclusion that "The Cromwell defendants provide[d] evidence as to the ways in which The Cromwell accommodated Lall—despite her never submitting a request to human resources" is also false and belayed by the evidentiary record. *See* 1-LALL-ER-009. This conclusion involves mixed questions of law and fact regarding what requests were made and what "reasonable accommodations" under the law actually are, which is reviewed *de novo. Powell*, Nos. 22-35361, 22-35362, 2023 U.S. App. LEXIS 23094, at *2-3. The Court's conclusion is clearly erroneous because Tracey made a formal request for accommodations to HR in October 2019 and was denied in November 2019. *See* 3-LALL-ER-506; 4-LALL-ER-596.

The District Court cites "giving her leave" and "sending her home when she had seizures" as ways the Cromwell "accommodated Lall." *See* 1-LALL-ER-009. "When an employee can work with a reasonable accommodation other than a leave of absence, an employer may not require that the employee take a leave of absence." *Budwig v. Allegiant*

*Air, LLC*, No. 1:18-cv-01068-EPG, 2020 U.S. Dist. LEXIS 160481, at *31 (E.D. Cal. Sep. 2, 2020) *quoting* 2 C.C.R. § 11068(c); *see also Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) (holding, in the context of a retaliation claim, that "[b]eing forced to take an unpaid leave of absence" is an adverse employment action).

The District Court acknowledged that Tracey was sent home on forced leave by Cromwell when she had seizures. *See* 1-LALL-ER-009. Tracey also presented substantial evidence that the Cromwell forced her on leaves of absence and involuntarily sent her home whenever she had a seizure/tremor at work, despite her repeatedly certifying via her medical provider that she could work with the seizure condition. *See* 4-LALL-ER-644, 645, 646, 647, 648, 663, 808-811, 839, 842, 856, 858. The forced leave was not an accommodation. Further, the District Court's conclusion in this regard was contradicted by the Cromwell's own summary judgment motion, which argued: (1) that "that Plaintiff had 'submitted a request for an accommodation' on October 23, 2019;" and (2) that the 2019 request was "for a leave of absence." *See* 2-LALL-ER-334:17-23.

At the hearing on summary judgment when the forced leave issue was argued the District Court erroneously rejected the argument asserting that "[t]here's no forced leave claim." *See* 1-LALL-ER-030:6-25. Tracey alleged that "the Cromwell forced Plaintiff back on leave of absence" when she had a "minor tremor/seizure" repeatedly throughout the FAC. *See* 2-LALL-ER-099-100, 112 (¶¶ 20, 21, 25, 26, 27, 91). Additionally, there is no law that stands for the proposition that summoning unwanted "medical attention for her" is an accommodation. *See* 1-LALL-ER-009.

The District Court's correctly concludes that Tracey made accommodations requests to her supervisor "Michael Norby, if she could use a guest restroom while at work, instead of an employee restroom," but erroneously concludes "that she never spoke to anyone in human resources about this request." *See* 1-LALL-ER-005:10-15. This evidentiary conclusion was entirely based on Tracey's deposition testimony submitted by the Cromwell, which shows that she did speak to HR about the request:

> Q. Did you ever ask to be able to use the guest restroom?
> A. Yes.
> Q. Who did you ask?
> A. Michael Norrby.

…
Q. *Did you ever talk to HR about using the guest restroom?*
A. No. <u>*I told them I was denied,*</u> but <u>*I never asked them if I could because they're not my manager*</u>.

See 4-LALL-ER-762-763(emphasis added).

The very evidence the District Court relies on for concluding that Tracey did not notify HR about her requested accommodations demonstrates that she had informed HR that she requested the accommodations and was denied them. *Id.* The Cromwell HR 30(b)(6) witness also testified that she requested the accommodations from her managers, but that HR did not grant them because HR did not "receive[] a medical certification for an ADA accommodation." *See* 3-LALL-ER-506. Tracey's testimony, together with Mazzone's testimony that Tracey requested accommodations and was denied them, and the formal letter dated November 21, 2019 denying accommodations established an issue of fact regarding whether Tracey's termination was pretext for discrimination, given the temporal proximity between the request and her termination.

Cromwell's Reply to their MSJ addressing the November 21, 2019 letter also cites ECF No. 92.1, and Exhibit 13 for the position that the

letter related to ADA leave, rather than ADA accommodations to use guest restroom. *See* 2-LALL-ER-334:17-23. ECF No. 92.1 is the declaration of Jacqueline Gadoy, Esq., attorney for the Cromwell Defendants and does not reference any leave of absence request. *See* 4-LALL-ER-792-793. Exhibit 13 to the Cromwell Defendants' Motion for Summary Judgment was a "Leave of Absence Designation Notice" dated December 5, 2018, nearly a year preceding the November 21, 2019 ADA denial letter. *See* 4-LALL-ER-794-799.

Sylvia Ocampo, another Cromwell HR 30(b)(6) witness also submitted a declaration in support of their MSJ where she declared that "Plaintiff never reached out to discuss the need for an alternative leave of absence, *such as a leave of absence under the ADA.*" *See* 4-LALL-ER-802 (emphasis added). Cromwell's argument that the November 21, 2019 letter related to ADA leave, rather than her request to use the guest restroom, is contradicted by their own witness's declaration. *Id.* There was no evidence cited by the Cromwell to rebut that Tracey's November 21, 2019 request was for her ability to have her seizures at work without being sent home and to use the guest restroom. *Id.* Further, even if there was evidence to rebut that claim, Cromwell denying Tracey's request for

reasonable ADA leave and subsequent termination of Tracey less than a month later is evidence of pretext. *Bell*, 341 F.3d at 865; *Rincon*, 638 F. App'x at 633.

At the hearing, the District Court appeared to acknowledge that Tracey had made the request for accommodations in November 2019 when counsel raised the accommodations denial letter. *See* 1-LALL-ER-059:15-060:6. The Court then proceeded to weigh the evidence by asking counsel to conclusively prove that Tracey did not "have to complete the ADA certification?" *Id.* No law was argued by Tracey or Cromwell that her failure to complete the ADA medical certification form absolved them of their duty to provide reasonable accommodations to a known disability.

The District Court's summary judgment decision is predicated on the false assumption that Tracey failed "to show that she sought accommodations, other than the one-time request she made to her supervisor in 2015 or 2016—four to five years before her termination." *See* 1-LALL-ER-009:17-20. This conclusion is clear error and a failure to consider pretext evidence warranting reversal and remand.

16

### *2. Tracey Also Presented Evidence That Other Similarly Situated Bartender Employees Were Treated More Favorably Under The Cromwell's Cash Variance Policy.*

"At the inference-of-discrimination stage, '[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) *see also Quaranta v. Mgmt. Support*, 255 F. Supp. 2d 1040, 1047-48 (D. Ariz. 2003); *Bergene*, 272 F.3d at 1140; *see also* 2-LALL-ER-240-242.

Tracey presented significant evidence that the disciplines of other Cromwell bartender employees showed that Tracey was treated differently in regards to the progression of discipline and starting points of her variance disciplines under the Cromwell's 2019 cash variance policy. *See* 4-LALL-ER-679-723; 5-LALL-ER-847-852. The policy included two discipline tracks: (1) "VARIANCE INDIVIDUAL OCCURRENCE;" and (2) "CUMULATIVE VARIANCES." *See* 5-LALL-ER-847-852. For individual occurrences, variances over $20.00 - $49.99 start at information entry ("IE") for the first incident, then documented coaching ("DC"), written warning ("WW"), final written warning

("FWW"), and suspension pending investigation/termination ("SPI/T"). *Id.* For individual variances between $50.00 - $99.99, the first incident is supposed to begin at DC, then WW, then FWW, and SPI/T. *Id.* For individual variances of $100.00 - $149.99, the discipline begins at WW, then FWW, then SPI/T. Finally, for variances $150.00 - $199.99 the discipline starts at FWW, then SPI/T. *Id.* For any individual variance over $200.00 the discipline is a SPI/T. *id.*

For cumulative variances, "[a]ny variance $19.99 or less will fall under monthly cumulative variances (i.e. May lst- May 31st, calendar month). "A cumulative variance is further defined as, multiple variances in a calendar month adding up to the dollar amount of$19.99." *Id.* The cumulative variance is given its own discipline schedule, always starting with IE, and progressing to DC, WW, FWW, and SPI/T for second, third, fourth, and fifth incidents. *Id.* The 2019 cash variance policy included a table that split the two types of variances into their own separate discipline schedules, with cumulative variances always starting at IE. *Id.* The individual incident variances were shown with separate starting points, and at the bottom of that variance table, there is a note that says "The discipline will progress to the next level for each additional incident.

18

The amount of the additional incident will not cause discipline to regress." *Id.* No such note is included at the bottom of the cumulative variance table. *Id.*

According to Cromwell, "Single incident variances and cumulative variances track together." *See* 2-LALL-ER-177. That is, the two discipline policies were not separate, and if an employee had an individual variance "between $100.00 and $149.99" in one month, and a much lower cumulative variance in the next month, the employee would progressed to the next level of discipline from WW, to FWW. *Id.* Assuming arguendo that Cromwell's position is truthful, Tracey was treated disparately under the policy.

For example, John Hernandez was disciplined by William Davis for a single cash variance shortage of -$100.04 that occurred on June 22, 2019. *See* 4-LALL-ER-679-684. This variance was a single incident variance, as reflected by the variance table included with the discipline. *See* 4-LALL-ER-681. Because this variance was over $100.00 for a single incident it should have started at a WW according to the cash variance policy Tracey was disciplined and terminated under and the Cromwell's own interpretation of the policy. *Id. see also1* 5-LALL-ER-847-852; *see*

19

*also* 2-LALL-ER-177. Mr. Hernandez, however, was given a documented coaching for the over $100.00 individual variance. *Id.*

Rachael O'Neill had an individual variance of $99.35 on March 2, 2019, and cumulative variance of $101.40 for the end of the month. *See* 4-LALL-ER-685-686. Rachel received a documented coaching for this individual variance of $99.35. *Id.* Several months later on June 16, 2019, Rachel had another individual cash variance of $29.32. *See* 4-LALL-ER-687. Rachel's discipline did not progress to written warning like Tracey's discipline. *Id.* Rather, Rachel was given yet another documented coaching. *Id.* The next month, on July 13, 2019, Rachel was again disciplined for having an individual cash variance of $100.00 on June 19, 2019. *See* 4-LALL-ER-689-690. Rachel was given a written warning despite the two prior variances. *Id.* Rachel had three cash variance disciplines, including an individual variance over $100.00 in 2019, and her discipline never progressed passed a written warning. *Id.*

Jorge Foncerrada had an individual of $100.00 on January 23, 2021. *See* 4-LALL-ER-693. Jorge was given an informational entry, rather than a written warning like Tracey was given. *Id.*

Joseph Campbell had a $101.46 individual variance on March 4, 2019, and was issued a written warning. *See* 4-LALL-ER-701. Campbell then had another individual variance of -$20.55 on May 21, 2019, and Joseph was given an IE, rather than progressing to a second WW or FWW like Tracey was disciplined. *See* 4-LALL-ER-699. Campbell had a variance of $84.72 on May 25, 2019, and Campbell was given a documented coaching, rather than a FWW or SPI/T, like Tracey had been disciplined. *See* 4-LALL-ER-695. Campbell had yet another variance, a cumulative variance, on June 30, 2019, of $32.23. *See* 4-LALL-ER-706. Cromwell did not progress Campbell's discipline to FWW or SPI/T. *Id.* Instead, Defendants reverted Campbell back to an IE. *Id.* Campbell then had another discipline for failure to record his revenue correctly on his revenue drop bag and was started at IE, rather than skipping to higher levels of discipline like Tracey had been disciplined. *See* 4-LALL-ER-709. Campbell had three individual cash variances in 2019, including his first one over $100.00, and one cumulative cash variance. Cromwell never progressed Campbell's discipline past WW.

Autumn Head had a cash variance of $27.80 on October 14, 2018, which started at DC. *See* 4-LALL-ER-633. A few months later on January

20, 2019, Autumn had another variance of $112.32 that started at written warning. *See* 4-LALL-ER-717. Autumn then had another variance of $29.05 on June 7, 2019, and was again issued a written warning. *See* 4-LALL-ER-718. On August 3, 2019, Autumn received yet another variance of $25.33 and was given a "Second Written Warning" rather than a FWW or termination like Tracey was disciplined. *See* 4-LALL-ER-713. Autumn had four cash variances in less than a one-year period, including an individual variance over $100.00 and never progressed past a written warning. *Id.*

On May 26, 2019, Devin Ray had a variance of $173.13. *See* 4-LALL-ER-720. Devin was given a documented coaching, rather than proceeding to a FWW like cash variance policy dictates, or a WW like Tracey was disciplined. *Id.*

On April 6, 2019, Brandon Thorns had a variance of $119.87. *See* 4-LALL-ER-722. Brandon had prior variance disciplines on February 8, 2019 ("DC-Variance"), and March 9, 2019 ("WW-Variance"). *Id.* Brandon's over $100.00 variance did not progress like Tracey's discipline. *Id.* Brandon was given a WW. *Id.* Brandon had three cash variances in a

12 month period, with one of those variances over $100.00 and he never progressed past a WW. *Id.*

Tracey had an individual cash variance of $100.41 on April 7, 2019. *See* 4-LALL-ER-823. Unlike Jorge Foncerrada, who had an individual variance of $100.00 on January 23, 2021 and was given an IE (*See* 4-LALL-ER-693), and Devin Ray who had a variance of $173.13 on May 26, 2019, and was given a DC (*See* 4-LALL-ER-720), and John Hernandez who was given a DC for an individual variance over $100 (*See* 4-LALL-ER-679-684), Tracey was given a WW despite having no prior variances. *See* 4-LALL-ER-693. Tracey had a cumulative variance of $23.58 in May 2019. *See* 4-LALL-ER-826. Unlike Joseph Campbell, who had a $101.46 individual variance on March 4, 2019, and was issued a written warning (*See* 4-LALL-ER-701), and a subsequent individual variance of -$20.55 on May 21, 2019, and was given an IE (*See* 4-LALL-ER-699), Tracey's cumulative variance began at WW, rather than IE. *Id.*

Tracey had another cumulative variance on September 30, 2019. *See* 4-LALL-ER-832. Cromwell progressed her discipline to FWW, unlike all the other bartender employees disciplined under the policy who committed the same conduct. *Id.* Tracey was terminated for a $78.96

variance on December 15, 2019. *Id. see also* 2-LALL-ER-169-71. During this period, Tracey had one individual variance over $100, one individual variance over $50.00, and two cumulative variances and was terminated supposedly because her first variance was over $100, which requires that the discipline start at WW, and all the other variances progressed to the next steps thereafter. *Id.* None of the other bartender employees were treated this way.

According to Cromwell "Plaintiff was written up for three cash handling variances in a six-month period that could have resulted in termination under The Cromwell's cash handling policy." *See* 2-LALL-ER-291. Joseph Campbell had four cash variances in a six-month period and his discipline never progressed past WW. *See* 4-LALL-ER-695-709. Rachel O'Neil also had three variances in a six-month period and her discipline never progressed past a WW. *See* 4-LALL-ER-685-690. The Cromwell's disparate application of the progressive discipline cash variance policy to Tracey as evidenced by these non-cancer and seizure afflicted employees comparator employees is evidence of pretext of discrimination, and argued by Tracey. *See* 2-LALL-ER-319:15-323:25.

24

Cromwell did not even dispute that these other employees were treated more favorably. *See* 2-LALL-ER-338. According to the Cromwell, the other employees' disciplinary records showing that other employees were treated more favorably under the policy were "irrelevant." *Id.* Cromwell argued that "Plaintiff fails to present any evidence regarding these employees' experiences and qualifications or the circumstances and underlying conduct which led to these variances. Plaintiff instead speculates as to the nature of these employees' disciplinary records, but of course, mere speculation and conjecture are insufficient to create a triable issue of material fact." *Id.* Cromwell advanced this argument without any citation to authority for the proposition that evidence of employee "experiences and qualifications" are factors necessary when showing pretext via disparate treatment. *Id.*

"'[W]hether two employees are similarly situated is ordinarily a question of fact.'" *Hawn*, 615 F.3d at 1157. "The employees' roles need not be identical; they must only be similar 'in all material respects.'" *Id.* "Generally, we have determined that 'individuals are similarly situated when they have similar jobs and display similar conduct.'" *Id. citing Vasquez*, 349 F.3d at 641.

25

Here, the comparator employees were, in fact, in the exact same position with the Cromwell as Tracey, they were all bartenders. *See* 4-LALL-ER-679-723. The comparator employees were all supervised by the same beverage department managers. *Id.* The comparator employees were all disciplined under the same cash variance policy as Tracey. *Id.* The District Court concluded that Tracey presented no evidence of pretext, while ignoring entirely the evidence that comparator employees were treated more favorably than Tracey, which is an error of both fact and law that this Court should review *de novo*.

### 3. Tracey Also Presented Direct and Circumstantial Evidence Of Other Instances Of Discriminatory Conduct, Harassment, Suspicious timing, Ambiguous Statements, And Other Circumstantial Evidence From Which An Inference Of Discriminatory Intent Could Be Drawn.

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn." *See Lewis*, 934 F.3d at 1185. The "placement of an employee on involuntary disability leave may constitute an adverse action." *See Timmons v. General Motors Corp.*, 469 F.3d 1122, 1128 (7th Cir. 2006) (finding that due to diminishment in the plaintiff

26

employee's material responsibilities, "[p]lacing ....[him] involuntarily on disability leave was an adverse employment action[]"). Discriminatory conduct outside the 300-day window for bringing a charge with the EEOC is "background evidence" to establish pretext. *Sams v. City of Chi.*, No. 13 CV 7625, 2014 U.S. Dist. LEXIS 164886, at *20 (N.D. Ill. Nov. 25, 2014); *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 892 (9th Cir. 2005). "Co-worker harassment '*is actionable* only if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *See Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). "The harassment must be 'both objectively and subjectively offensive.'" *Id*.

Here, Tracey presented substantial evidence that Cromwell did not want Tracey to work at all if she was going to have tremors/seizures. On June 25, 2018, Tracey's supervisor, Joseph Ruchaber, sent an email to human resources reporting that Tracey had been having tremors at work that day. *See* 4-LALL-ER-645. Tracey's supervisor, Michael Norby, responded concerned about Tracey having "seizures while working" and wanted to know whether "any guests witnessed this." *See* 4-LALL-ER-644. On July 1, 2018, Tracey again had a tremor at work, took a break,

but expressed she did not want to be sent to the hospital or sent home, and returned to the bar to finish her shift. *See* 4-LALL-ER-647.

Norby emailed human resources informing them that he was "[j]ust being told that Tracey had to leave the bar and go to the restroom cause she's having another seizure." *See* 4-LALL-ER-648. Norby requested permission to send Tracey home because he believed it was "in the best interest of the business to send her home" because she had a tremor at work, despite being cleared by her doctor for full duty work. *Id.* at 646, 839, 842.

On November 5, 2018, Tracey had another tremor at work and went to the employee restroom to allow the tremor to pass. *See* 4-LALL-ER-656-657, 839, 842. Tracey refused medical treatment and was sent home from work. *Id.* On November 6, 2018, Norby sent an email to human resources notifying them Tracey left early because of a "seizure," noting that he was "[n]ot sure what I can do regarding her situation as *she has refused medical attention both times, but its effecting service as we lose a bartender when she leaves early*." *Id.* (emphasis added). Tracey testified credibly that she did not ask to leave work early because of her tremors, she left "[w]hen they forced me to. It wasn't voluntary." *See* 4-LALL-ER-

28

839. Cromwell forced Tracey to go home when she had tremors at work, "which was not something that I volunteered to do. So, yeah, they forced me to go home when I had a tremor…yes, they did inhibit me from working." *See* 4-LALL-ER-842.

On November 8, 2018, Tracey was called in to meet with human resources and she noted that she had provided them a doctor's "full duty release with no restrictions," and human resources informed Norby that he needed to let her work. *See* 4-LALL-ER-655, 663; *see also* 5-LALL-ER-853. At the meeting, Tracey informed human resources that she was fine, the seizures pass, and that she "just want[ed] to work. I have beat this and I just want to be strong and work hard." *Id.* at 663.

On November 10, 2018, Tracey went to the restroom while on her shift to let a tremor pass. *See* 4-LALL-ER-654. Rather than allow Tracey to have the tremor and return to finish her shift, Cromwell again called "security/EMT" to evaluate Tracey, despite her doctor's authorization return to work full duty despite the tremor condition. *Id.* Tracey was again sent home. *Id.* at 654, 839, 842. On November 15, 2018, Sylvia Ocampo notified Tracey's manager, Michael Norby, that Tracey was being "placed on CCLOA for the next 15 days *while she follows up with*

*her health care provider.*" *See* 4-LALL-ER-652 (emphasis added). The Cromwell refused to accept Tracey's medical provider's certification that she could work with her dystonia condition, requiring her to get another authorization to work. *Id.*

On November 16, 2018, Tracey submitted a grievance form to her union alleging that the Cromwell Defendants placed her on a forced leave of absence because she was having tremors at work, despite her doctor saying she could work. *See* 4-LALL-ER-809-811. The grievance letter sent by the Local 165 Defendants expressly stated Tracey was "Contesting a Company Forced Leave of Absence." *Id.* Cromwell 30(b)(6) HR witness, Ashley Mazzone, was asked about the forced leave of absence and did not dispute that it was involuntary: "I mean, we -- *I don't want to say forced her*, but if we're referring to the CCLOA, *we put Tracey on leave, again, out of our concerns just for her health and safety, because she was having so many medical episodes at work.*" *See* 3-LALL-ER-510.

Tracey returned to her medical provider and obtained another certification that she could work despite the dystonia condition. *See* 4-LALL-ER-808; 5-LALL-ER-856. Tracey was forced again by the Cromwell in January 2019 to obtain yet another certification from her

medical provider that she could work with her dystonia condition. *See* 5-

LALL-ER-858.

On March 12, 2019, Tracey's manager, Norby, sent human

resources an email about Tracey's tremor condition:

> I would like to bring an on-going concern/issue regarding one of my bartenders at Cromwell, Tracey Lall.
>
> Sylvia O'Campo is included in this email as she has been involved with Tracey's situation for the past year. *Sylvia can fill you in on her medical condition*, LOA dates and CCLOA dates.
> …
> *Tracey has been on an off LOA or CCLOA regarding her medical condition. One of the side effects of her medical condition are seizures. She has had 2 recent episodes within the past 10 days* (3/2/19 and 3/11/19) *and I have attached the security reports from these days. There have been multiple time this has occurred as well. When this occurs, <u>guest service is effected as</u> <u>she has to leave</u> and we become short staffed.* In addition, we are concerned for her safety as we do not want her to injure herself while behind the bar.
>
> In an separate concern, *we have noticed a change in Tracey's personality <u>each time</u> throughout her shifts while at work.* She *comes in to work in a positive/upbeat manner and that quickly degrades over the first few hours* of her shift. *She also seems to lose concentration as well.* My management team and I, feel there might be more going on then we see. We are concerned that Tracey might be under the influence of alcohol or drugs (*whether related to her condition or not*) while at work. We are concerned about this for the following reasons:
> • Consistently using the restroom
> • Change of personality throughout her shifts
> • Loss of concentration while behind the bar

• Refuses all medical assistance *when her medical conditions acts up at work*

To be honest, *we have not noticed any slurred speech, the smell of alcohol on her breath and dilatation of her eyes/pupils.*

Due to the sensitivity of *Tracey's condition*, I am sending this email because *I am going to request a drug/alcohol test the next time we notice any of our concerns mentioned above* and I want HR to be aware.

*See* 4-LALL-ER-661-662 (emphasis added).

Human resources responded acknowledging that "The last two times HR requested medical paperwork from her it came back with no restrictions/ no modifications requested." *See* 4-LALL-ER-660. Human resources authorized Norby to drug test Tracey for the known symptoms of her cancer treatment related tremor condition. *Id.* This email evidences Norby's clear issue with Tracey's tremor condition and the symptoms it causes. *See* 4-LALL-ER-661-662. Norby references "Tracey's…medical condition," "2 recent episodes within the past 10 days," the "multiple time this has occurred," and that he believed "guest service is effected as she has to leave" when she has a tremor. *Id.* Norby goes on to note that "each time" she has a tremor, "we have noticed a change in Tracey's personality," she "lose[s] concentration," uses the restroom, and "[r]efuses all medical assistance when her medical

conditions acts up at work." *Id.* Because of these issues, rather than accommodate Tracey by allowing her to use the guest restroom to have her tremors at work and let them pass, Norby instead decided he was going to drug test Tracey despite acknowledging that no manager "noticed any slurred speech, the smell of alcohol on her breath and dilatation of her eyes/pupils." *Id.*

These comments from Norby are direct evidence that Norby intended to subject Tracey to an adverse employment action because of her dystonia condition. *Id.* A drug test is an adverse employment action and part of Article 6 of the CBA titled "DISCIPLINE," and found in the subsection 6.01 "Cause for Discharge." *See* 5-LALL-ER-861. Prior to this email Tracey had never once been drug tested or suspected of drug or alcohol use at work. Less than two months after this email Tracey began receiving discipline almost every month until she was terminated. *See* 4-LALL-ER-832-833. *Id.*

Prior to 2019, Tracey had just four total disciplines between April 23, 2014 (date of hire), and March 12, 2019. *See* 4-LALL-ER-812-815, 832-833. Three were for attendance, and one policy violation related to clocking in shortly after Tracey's date of hire. *Id.* After Norby's email to

33

HR about his "concerns" about Tracey's "medical condition," her "Consistently using the restroom," the "Change of personality throughout her shifts," the "Loss of concentration while behind the bar," and her refusal to accept unwanted "medical assistance when her medical conditions acts up at work" when having a "seizure" "episode," Tracey received eight (8) disciplines and was terminated. *Id.* The March 12, 2019 email is direct evidence of discrimination, as the decision to take the adverse employment action of drug testing Tracey was because she was having "seizure" "episodes" at work. *See* 4-LALL-ER-661-662. The suspicious timing of the discipline is circumstantial evidence of pretext.

One of those disciplines included Tracey's refusal to take a drug test. *See* 4-LALL-ER-664-666, 829, 832. Cromwell suspended Tracey for refusing to take the drug test, and held a due process meeting. *Id.* at 664. HR employee Maurice Walker asked Tracey if she knew why she was there, and her response was "Yes. I was having tremors behind the bar due to kemo that I have Wed. *I was told I was making customers feel uncomfortable because my hands were shaking.*" *Id.* at 664 (emphasis added). The evidence that Tracey was told by her manager that her

tremor was making "customers feel uncomfortable," is direct evidence the supervisor's animus towards Tracey over her tremor condition. *Id.*

Cromwell asked why Tracey's hands were shaking, and her response was "[s]ide effect of the medication that I take with kemo." *Id.* They asked what medication she was taking, and she responded "Tumoxin. CBD to calm nerves which works." *Id.* They asked Tracey if she took her medications that day and she responded "I took CBD in the morning and the tumoxin the night before." *Id.* They asked her if she had been drinking, and her response was "No. Not allowed to drink" because she was treating for cancer. *Id.* Tracey then described what happened that day:

> 4:30pm I could feel the tremors coming on. I was making a drink and bar was full. Started walking to the bathroom. Legs started twitching. *I was told by Norrby that I made guest feel uncomfortable when I left the bar going to the bathroom.* The emt told me the same thing and saw what happened. The told me that I should go home and get some rest. I went home.

*Id.* at 665 (emphasis added).

Tracey was called into Norby's office before she left for the day. *Id.* Tracey was asked to take a drug test because she had a tremor at work, and she refused the test because she "wanted to talk to my doctor first." *Id.* Tracey again notified Cromwell that the tremors/seizures last

between one and four minutes, and acknowledged that the tremors leave he "[a] little loopy" for moments after, and again noted that she has authorization from her "doctor allowing me to work." *Id.* Cromwell then asked Tracey if she was "aware that refusing to take a alcohol and drug test is grounds for termination," to which she responded "NO I was not aware of that." *Id.*

The CBA provides that "[w]here there is *reasonable cause to believe* that an employee is under the influence of alcohol or a controlled substance...*the employee, after being notified of the contents of this subsection,* must consent to an immediate physical examination at an independent medical facility *or suffer the penalty of discharge.*" *See* 5-LALL-ER-861-862 (emphasis added). The CBA was clear that to be subject to the penalty of refusing consent to the drug test, the employee was first required to be notified of the CBA provision that refusal would result in discharge. *Id.* There was a video of interview with Norby played at the meeting. Tracey commented that Norby was:

> They were mean to me and very cold. I was really just so out of it. Asked me questions over and over and giving me anxiety. I was getting frustrated. Management is well aware of everything and all of my coworkers are aware as well. They forced me to sign that paper.

*See* 4-LALL-ER-666.

Tracey again noted that Norby did not inform her that refusing the drug test was grounds for termination, and that if she had been told "I would've taken it." *Id.* The transcript of the due process meeting indicated that Maurice Walker Jr., of human resources was present at the due process meeting for the drug test discipline, and Michael Contorelli, Business Representative from Local 165 was also present along with Tracey. *See* 4-LALL-ER-664. At first, Contorelli, the Local 165 Defendants' 30(b)(6) witness, testified that he did not file a grievance on behalf of Tracey relating to this drug test discipline "Because Tracey never told me about it." *See* 3-LALL-ER-453. This testimony was not true.

Later in the deposition, when Contorelli was presented with notes of the meeting, he acknowledged that he was at the meeting because Tracey "called me early on that morning and said that she needed me very badly and that there would be a meeting around 4:30 that afternoon." *Id.* at 475-476. According to Contorelli, he asked the Cromwell whether Tracey was informed of the provision in the CBA relating to employee drug tests, and his response was "Yes, I did." *Id.*

According to Contorelli, Walker did not represent that Tracey had been informed of the CBA drug test refusal provision. *Id.*

When asked why he did not file a grievance on behalf of Tracey for the drug test discipline a second time, he initially was going to again lie about it "I was never," but then corrected himself asserting that "when I left, Maurice Walker and myself came to the same conclusion that she wasn't given all of the information." *Id.* at 477. When Contorelli was asked why he did not request no discipline be imposed for the Cromwell's failure to inform Tracey of the termination provision, he responded "I was shocked when I found out she had discipline. I didn't find that out until when I got the information at the board of adjustment" in relation to Tracey's termination. *Id.* The Cromwell's 30(b)(6) witness, Ashley Mazzone, was questioned about this discipline as well, confirming that Tracey's manager, Norby, "did not inform her that she could be terminated." *See* 3-LALL-ER-498.

Despite not being informed that there was disciplinary consequences of refusing to take the drug test, the Cromwell disciplined Tracey anyway despite not following the CBA. "Evidence that the employer deviated from its standard procedure or policies in taking an

adverse employment action against a plaintiff may be relevant to the pretext inquiry." *See Rodríguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 50 (1st Cir. 2019); *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998). Here, Norby took drug test adverse employment action against Tracey because she had a tremor at work, then deviated from the CBA rule/policy requiring him to notify Tracey she could be terminated for refusing the drug test, and suspended her employment for refusing, and Cromwell did not remove the discipline when it was clear that Norby did not follow the CBA policy, which is evidence of pretext. *Id.*

There was also an issue of material fact regarding whether the variance policy was two separate tracks of discipline, or a single track. According to Cromwell, "Single incident variances and cumulative variances track together." *See* 2-LALL-ER-177. The written policy itself, and the disciplines imposed on the other comparator employees under that policy indicates otherwise. *See* 4-LALL-679-723; *see also* 5-LALL-ER-847-852. The variance policy has a two separate discipline tables, one for cumulative variance and one for individual variance. *See* 5-LALL-ER-852. There is a note only under the individual variance table says

discipline for that table "will progress to the next level for each additional incident" that is not found under the cumulative variance table. *Id.*

Joseph Campbell had three individual variance in a row between March 3, 2019 ($101.46 individual variance - WW), May 21, 2019 ($20.55 individual variance – IE) and May 25, 2019 ($84.72 individual variance – DC). *See* 4-LALL-ER-695-701. Campbell then had a cumulative variance for the month of June 2019. *Id.* at 706. Campbell's discipline did not progress from a DC to a WW, or to FWW. *Id.* Rather, Campbell was given an IE for his first cumulative variance of the year. *Id. see also* 5-LALL-ER-852. For Campbell, his single incident variances and cumulative variances did not track together. *Id. see also* 2-LALL-ER-177.

Because Campbell's disciplines tracked separately for individual variances and cumulative variances there was disputed issue of material fact regarding whether the Cromwell deviated from the variance policy when tracking Tracey's individual and cumulative variances together. The Cromwell's deviation from the policy when disciplining Tracey is also evidence of disparate treatment and pretext. *See Rodríguez-Cardi*, 936 F.3d at 50; *Brennan*, 150 F.3d at 29.

It was undisputed that attendance and other policy disciplines were tracked separately from variances. Indeed, the Cromwell's 30(b)(6) witness expressly testified that "We have three tracks of discipline, and that would be policy and performance, variance, and attendance." *See* 3-LALL-ER-487. The systems progress separately. Campbell was disciplined on August 6, 2019, for incorrectly recording his revenue drop envelope. *See* 4-LALL-ER-709. Campbell was discipline for "Policy/Performance," and in accordance with the separate track system, Campbell was given an IE. *Id.*

Tracey had two policy disciplines in 2019. *See* 4-LALL-ER-832. Tracey was disciplined for the drug test policy and given a FWW, rather than an IE or no discipline for Norby not following the CBA. *Id.* Tracey was disciplined for "unauthorized time clock and unapproved overtime" and given a WW, skipping the steps of IE and DC. *Id.* The Cromwell's deviation from the established progressive discipline procedure and disparate treatment of Tracey is evidence of pretext.

Finally, Tracey presented evidence of harassment by her managers and co-workers that changed the conditions of her employment. "Under the ADA, an employer 'shall not require a medical examination and shall

41

not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.'" *Turner v. Phillips 66 Co.*, 791 F. App'x 699, 708 (10th Cir. 2019). Drug tests are not considered medical examinations unless used to find out what medication an employee is on related to her medical condition. *See EEOC v. Grane Healthcare Co.*, No. 3:10-250, 2015 U.S. Dist. LEXIS 123133, at *141 (W.D. Pa. Sep. 15, 2015); *see also Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 580 (6th Cir. 2014).

Tracey presented direct evidence that her manager, Norby, chose to drug test her specifically because she had a tremor at work, went to use the restroom, and "[r]efuses all medical assistance when her medical conditions acts up at work." *See* 4-LALL-ER-661-662. Norby stated he was going to drug test Tracey the next time he noticed that Tracey had a tremor/seizure episode that affected her concentration and personality to find out if Tracy was taking "drugs (whether *related to her condition* or not) while at work." *Id.* (emphasis added). Norby did exactly that, demanding that Tracey submit to a drug test because her hands were seen shaking and she went to take a bathroom break to allow the tremor

42

to pass. *Id.* at 664-666. Drug testing Tracey for refusing unwanted medical assistance and to see what medication she was taking for her medical condition is evidence of pretext of discrimination, and harassment. The District Court improperly weighed this direct evidence, asking "Is that a blatant lie that he is just going to accuse her for fun, or is it, rather, a human resources documentation of what they're observing and their concerns?" *See* 1-LALL-ER-025:8-027:6.

When counsel highlighted that the email expressly said Norby was going to drug test Tracey when her tremor happens again that he was going to drug test her despite acknowledging no signs she was on alcohol or drugs, the District Court pivoted to the statute of limitations ("SOL") issue, despite the incident being evidence of pretext. *Id.* The District Court then asserted that she was "unaware of any case law that would preclude an employer from documenting observations that they're making and raising concerns," that she "appreciate[d] the recognition that she didn't have a -- I'll call them some of the stereotypical symptoms of someone who is appearing at work under the influence, but really, my concern is more of the accusation in your filing that there was some grand conspiracy to play 'gotcha' with her. And I don't see that based on

anything I have reviewed." *Id.* This comment from the District Court includes mixed errors of law and fact that should be reviewed de novo. First, the email was direct evidence that Norby took an adverse employment action of drug testing Tracey because of her medical condition. The Court acknowledged that Norby had no evidence Tracey had "stereotypical symptoms of someone…under the influence." *Id.* The Court then makes a clear error of fact, asserting that Tracey alleged Cromwell had "some grand conspiracy to play 'gotcha' with her." *Id.* The evidence was that Tracey's supervisor had animus towards her disability, and took an adverse employment action against expressly because of her medical condition. Then the Court weighed the evidence, asking "And so apart from this e-mail, what are you relying on" for the discrimination claim. *Id.*

Tracey also expressly filled out a grievance form with Local 165 notifying the Cromwell that her co-workers had recorded her in the employee locker room while she was having a seizure. *See* 4-LALL-ER-810. Tracey testified at her deposition that she notified the Cromwell human resources and her union about the employees recording her while she was having a seizure and that the human resources employee she

spoke told her that they could not obtain the video. *Id.* at 777, 840. The matter was also addressed at the board of adjustment meeting for her termination as well. *Id.* at 677.

The Cromwell presented no evidence that they conducted any actual investigation into Tracey's allegations of harassment before her termination, and supposedly held one meeting with one of the employees after Tracey's termination. *Id.* The Cromwell also repeatedly refused to accept the recommendation of Tracey's treating medical providers that she could return to work with the dystonia condition, putting Tracey on forced leave and forcing her to repeatedly submit certifications that she could return to work. *See* 4-LALL-ER-805-808; *see also* 5-LALL-ER-853-854, 858-859.

The Cromwell's explanation for its conduct was "[o]ut of concern for Plaintiff's safety," which by its very nature is an admission that it took these adverse actions (drug test, forced leave) because of her medical condition. *See* 2-LALL-ER-165:7-8, 177:1-12, 334:24-335:5, 3-LALL-500. The Cromwell's "safety defense" has been a "narrow scope; the employer must offer more than mere conclusions to present such a defense." *See Ackerman v. W. Elec. Co.*, 860 F.2d 1514, 1519 (9th Cir. 1988); *Sterling*

45

*Transit Co. v. Fair Employment Practice Comm'n*, 121 Cal. App. 3d 791, 175 Cal. Rptr. 548 (1981)(conjecture of possibility of harm does not overcome strong policy of providing equal employment opportunity). Tracey argued on summary judgment and at the hearing that Cromwell had no evidence that Tracey's tremor condition caused any safety issue, and that her medical provider repeatedly certified her for work. *See* 1-LALL-ER-027:10-031:2. The District Court then asked "Having a seizure in public behind the bar with there's glass or next to customers, that -- that wouldn't be of concern to you as someone who owned a business." *Id.* at 028:18-24. When counsel responded that that is what reasonable accommodations of letting her use the restroom without sending her home was for, the District Court falsely declared "There's no forced leave claim." *See* 1-LALL-ER-030. The District Court improperly weighed the evidence in favor of Cromwell, rather than Tracey, the non-moving party.

There was a disputed issue of fact regarding whether the Cromwell's actual concern was for Tracey's safety, or whether the "safety" excuse was just pretext for sending Tracey home involuntarily and forcing her onto leave because "guests witnessed" her seizures (4-LALL-ER-644), it was "in the best interest of the business to send her home" (4-

46

LALL-ER-648), or that her seizures were "making customers feel uncomfortable" and when her doctors continually certified her to work, the Cromwell issued her nine disparate disciplines in 2019 to justify terminating her for progressive discipline. *See* 4-LALL-ER-664. The District Court made critical clear errors of fact and law, ignored evidence, and improperly weighed the evidence in favor of Cromwell when granting summary judgment, and this Court should reverse and remand for trial.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO CONSIDER APPELLANT'S COVID-19 TOLLING ARGUMENTS.

"A complainant…is not obliged to anticipate defenses or to allege facts which he is not required to prove." *Albi v. St. & Smith Publ'ns, Inc.*, 140 F.2d 310, 314 (9th Cir. 1944). "[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). Legal arguments raised in a reply that are responsive to issues raised in an Opposition are not considered a new issue raised for the first time in a reply brief. *See ML Liquidating Tr. v. Mayer Hoffman McCann*

*P.C.*, No. 2:10-cv-02019-RRB, 2011 U.S. Dist. LEXIS 157070, at *4 (D. Ariz. Mar. 11, 2011).

Here, the Cromwell Defendants raised a SOL defense in their MSJ and their Opposition to Tracey's MSJ. *See* 2-LALL-ER-183:17-184:16; 287:2-288:6. Tracey responded to the SOL argument in both her Opposition to the Cromwell's MSJ, and the Reply to the Opposition to her MSJ. *Id.* at 235:11-240:10; 319:5-14; 1-LALL-ER-007:4-5. Undersigned counsel concedes that, while he raised the COVID-19 tolling argument in the Opposition to the Cromwell's MSJ, the District Court is correct that the argument was "limited and unsupported by authority." *See* 1-LALL-ER-007:4-19.

At the hearing, the District Court was initially under the impression that the SOL argument was not responded to at all. *Id.* at 1-LALL-ER-056. Counsel informed the Court that he had thoroughly replied to the argument in the reply brief. 1-LALL-ER-056:10-57:25. The District Court then reviewed the Reply brief and admonished Appellant's counsel that it should have been included in the Opposition. *Id.* at 073:12-24. The Court's written order cited to this Court's precedent holding that "arguments raised for the first time in a reply brief are waived." *See* 1-

48

LALL-ER-007:1-5 *citing Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012) (quoting *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012)). In both cases, the party had raised an entirely novel, non-responsive argument for the first time in the reply. *Id.*

Such is not the case the case here. As the Court acknowledges, Appellant raised the tolling arguments in the Opposition though more "limited and unsupported by authority." *See* 1-LALL-ER-007:4-19; *see also* 2-LALL-ER-319. These were the same arguments Appellant expanded on in the reply brief. *Id.*

Appellant included the COVID-19 pandemic tolling argument in the First Amended Complaint ("FAC"). *See* 2-LALL-ER-104-105. Defendants also moved to dismiss the complaint because for SOL and failure to exhaust administrative remedies. *See* 5-LALL-ER-869-872. Appellant responded with the very same COVID-19 equitable tolling argument. *Id.* at 874-888. The Cromwell responded to that Opposition to their Motion to Dismiss with a reply. *Id.* at 899-906.

At the hearing, the Court asked whether the Cromwell's counsel was ready to respond to the SOL arguments, which they responded "I am,

your Honor." *See* 1-LALL-ER-073-074. After reviewing the reply and giving the Cromwell opportunity to respond, the District Court decided it was "going to nonetheless take this under advisement" because, while it remained "concerned that Ms. Lall did not exhaust her administrative remedies, and I am also concerned about the timeliness issue especially given the COVID-19 pandemic and the tolling that went into effect as it related to the filing of certain claims by then-Governor Sisolack." *Id.* at 090:20-91:4.

It is unclear what occurred between the hearing, which operates as the order for claims against Local 165, and the entry of the written order several weeks later. *Id.* at 007, 090. But the Court decided, after ruling it would consider the tolling argument, to not consider them when issuing the written order. *Id.* The COVID-19 tolling SOL argument was raised in the Opposition to the Cromwell's Motion to Dismiss, which Cromwell responded to, raised again but was unsupported by authority in the Opposition, raised again and supported by authority in the Reply, counsel for the Cromwell was given an opportunity and did respond to the arguments at the hearing, and the Court ruled it would consider the matter out of concern for the "COVID-19…tolling that went into effect."

*Id.* The District Court abused its discretion when it declined to "consider Lall's argument from her reply brief *and rely instead on the argument— albeit limited and unsupported by authority—in her <u>motion</u>*," when the COVID-19 tolling argument was raised in the summary judgment Opposition, and Cromwell had an opportunity to respond twice. *See* 2-LALL-ER-319:5-14

Here, there was no dispute that the termination was within the SOL period. "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *See Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1851 (2019). Because the charge-filing requirement is a "nonjurisdictional limitations period" it is "presumptively subject to equitable tolling." *Boechler, P.C. v. Commissioner*, 142 S. Ct. 1493, 1500 (2022); *AMTRAK v. Morgan*, 536 U.S. 101, 104 (2002).

"[A] court's discretion to toll the statute of limitation should be based on three criteria: (1) whether the defendant actively misled the plaintiff as to his or her rights under Title VII; (2) whether the plaintiff was in some extraordinary way prevented from asserting those rights; and (3) whether the plaintiff asserted his or her rights in the wrong

forum." *See Anderson v. Wis. Gas Co.*, 619 F. Supp. 635, 638 (E.D. Wis. 1985) *citing Int'l Union of Elec. v. Robbins & Myers, Inc.*, 429 U.S. 229, 238 (1976). "Nevada courts have made clear that discrimination victims' cases should not generally be thrown out because of minor procedural mistakes." *Roberts v. Clark Cty. Sch. Dist.*, No. 2:15-cv-00388-JAD-PAL, 2016 U.S. Dist. LEXIS 163800, at *4 (D. Nev. Nov. 28, 2016).

Courts have held that the emergency circumstances caused by the COVID-19 pandemic can justify the tolling of the statute of limitations period so long as the party was diligent in pursuing the claim. *Payne v. Shinn*, No. CV-20-0459-TUC-JAS, 2021 U.S. Dist. LEXIS 150082, at *9 (D. Ariz. Aug. 10, 2021). Further, because the 300-day statute of limitations period at issue here is subject to a work sharing agreement between Nevada's NERC and the EEOC, the Nevada state claims were subject to the 300 day period. *See Fort Bend*, 139 S. Ct. at 1846; *Nickler v. Clark Cty.*, 802 Fed. Appx. 262, 2020 WL 710229, at *1 (9th Cir., 2020); *Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1174-75 (9th Cir. 1999).

Nevada law in relation to tolling of the statute of limitations applies to the state discrimination claims. On March 12, 2020, the Governor of

Nevada issued an emergency order related to the COVID-19 pandemic ordering all SOL for state legal claims tolled.[1] As such, the statute of limitations period for Appellant's state discrimination claims were tolled until 30 days after the emergency order was rescinded. *Id.* The order was rescinded on July 31, 2020.[2] Thus, 142 days (over 4 months) must be added to the SOL for any matter filed after March 12, 2020. *Id.*

The District Court abused its discretion when it did not apply the COVID-19 tolling directive to Tracey's Nevada discrimination claims. The period applies to all the conduct culminating in Tracey's termination occurring after July 29, 2019, which is 442 days from the date the charge was filed on October 13, 2020. *See* 5-LALL-ER-891.

Tracey also diligently pursued her claims by scheduling an investigatory meeting with the EEOC in July 2020, and that due to the COVID-19 pandemic and the shutdown of workplaces in Nevada pursuant to the Governor's order, that meeting could not be held until October 2020. *See* 2-LALL-ER-104. The COVID-19 pandemic was an

---

[1] https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-01_-_COVID-19_Declaration_of_Emergency_Directive_009_(Revised)/
[2] https://gov.nv.gov/News/Emergency_Orders/2020/2020-06-29_-_COVID-19_Declaration_of_Emergency_Directive_026/

extraordinary event that hindered Tracey's ability to file the charge with the EEOC. *Id.* The District Court should have considered this COVID-19 tolling argument, given it was raised in the Opposition to the Cromwell's MSJ, the Reply, and in several other prior pleadings they responded. This is especially true given that the District Court expressly cited the COVID-19 pandemic when excusing Local 165's failure to timely proceed with the arbitration. *See* 1-LALL-ER-040, 055.

## III. THE DISTRICT COURT CLEARLY ERRED WHEN GRANTING SUMMARY JUDGMENT TO LOCAL 165 AND THE CROMWELL ON THE HYBRID LMRA §301 DUTY OF FAIR REPRESENTATION CLAIM BECAUSE LOCAL 165 BREACHED ITS DUTY OF FAIR REPRESENTATION EXCUSING ANY FAILURE TO EXHAUST CONTRACTUAL REMEDIES.

To prevail on a hybrid Section 301 claim, the plaintiff must show: (1) that the employer violated the collective bargaining agreement; and (2) that the union violated its duty to represent the employee fairly in the grievance process. *DelCostello v. [Int'l Bhd. of] Teamsters*, 462 U.S. 151, 164-65 (1983); *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). Generally, an employee is required to exhaust their contractual remedies under the CBA before bringing their claim in court. *Jackson v. S. Cal. Gas Co.*, 881 F.2d 638, 646 (9th Cir. 1989). "The employee, however, may obtain

judicial review of his claim despite his failure to exhaust contractual remedies if he can show that the union breached its duty of fair representation." *Id.* "Three exceptions exist to excuse a plaintiff's failure to exhaust contractual remedies prior to filing a breach of CBA claim." *Debeikes v. Hawaiian Airlines, Inc.*, 141 F. Supp. 3d 1075, 1092 (D. Haw. 2015) *citing Vaca*, 386 U.S. at 185; *Carr v. Pac. Mar. Ass'n*, 904 F.2d 1313, 1319 (9th Cir. 1990). Relevant here was the exception "where:…the union's actions breach its DFR in handling the grievance." *Id.*

This Court has recognized "where 'the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if…the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance.'" *Carr*, 904 F.2d at 1319-1320 *citing Vaca v. Sipes*, 386 U.S. at 185. In *Carr*, this Court rejected the employee's argument that the "first exception to the exhaustion requirement" applied because "*under the terms* the grievants can utilize the contractual remedy process without the help or approval of the union." *Id.* (emphasis added). The *Carr* case was considered distinguishable from cases like *Vaca v. Sipes*,

"where the union has assumed sole responsibility of preparing and presenting the grievant's claim." *Id.*

In the cases where the union is solely responsible for "administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances." *Vaca*, 386 U.S. at 194. In such cases, a union breaches its duty of fair representation when it ignores a union member's complaint, or processes "the grievance in a perfunctory manner." *Id.*

On summary judgment, Tracey argued that Local 165 breached the DFR by handling her grievance in a arbitrary and perfunctory manner by (1) not investigating 2019 grievance; (2) had not drafted any grievances for Tracey or decide what should actually be grieved under the CBA; (3) did not enforce the terms of the CBA regarding production of documents relevant to defending her grievance; (4) did not enforce the terms of the CBA regarding notice of written warnings given to employees; and (5) did not enforce the right of the union "to challenge any live discipline at the time of [Tracey's] termination despite

acknowledging his duty to enforce the CBA." *See* 2-LALL-ER-124:6-19, 145:16-147:15, 157:12-160:20.

Local 165's MSJ on the DFR claim argued that (1) "**Lall never requested that Local 165 file grievances about any of her discipline except for her termination, which bars any claim based upon it**" constituting a failure to exhaust remedies; (2) Local 165 did not breach the DFR because even if it made "a wrong decision" it is not "liable…unless there is proof of discrimination or bad faith," recklessness to employee rights, or its decision were arbitrary; (3) that after Local 165 scheduled arbitration seven months after Tracey's termination Tracey "**made it clear she would not attend**" the arbitration; (4) that Local 165 conducted an investigation because it conducted some minimal investigation; and (5) made a good faith judgment that it would not prevail at arbitration because Tracey stated she would not attend arbitration. *See* 3-LALL-ER- 375-383. For the exhaustion argument, Local 165 cited to *Jackson*, *Debeikes*, and a district court case *Jay v. SEIU-UHCWW*, 2017 WL 697110 at *2-4 (N.D. Cal. Feb. 22, 2017).

Tracey's opposition addressed the exhaustion requirement by similarly citing the exact pages from *Jackson* and *Debeikes* where the exceptions to exhaustion were discussed. *See* 3-LALL-ER-409:24-410:4. Tracey then proceeded to argue that Local 165 breached the DFR because: (1) Local 165 admitted it could "grieve all the prior live disciplines the moment Tracey was terminated;" and (2) Local 165 chose "arbitrarily and capriciously in egregious disregard for Tracey's contractual rights" to not to enforce the CBA or challenge the live grievances at her termination excusing exhaustion. *Id.* at 410:2-20. Tracey further argued that Local 165 did not conduct even a minimal investigation into the basis of Tracey's termination, also constituting arbitrary, capricious or perfunctory processing of the termination grievance. *Id.* at 410:20-413:24.

Tracey also initially agreed that she would participate in mediation when Local 165 notified her about it. *Id.* at 407:1-14. However, later Tracey expressed her desire to have her attorney present at the mediation. *Id.* Only when Local 165 asserted it would not allow her attorney to be present did she state should not attend. *Id.* Local 165 admitted in the MSJ that the CBA requires the employer to produce all

documents relevant to a grievance within three (3) working days of a request, and simply does not enforce the provision. *See* 3-LALL-ER-360:1-23. Local 165 admitted that the CBA requires that written warnings and discharge notices are required to be sent within seventy-two (72) hours of issuance, and that Cromwell did not follow the provision, which it also does not enforce. *Id.* Local 165 admitted that Tracey had been "progressively disciplined for cash shortages." *Id.* at 373:17-20. Local 165 admitted that it was aware of Tracey's "live discipline" before the Board of Adjustment meeting. *Id.* at 368:4-8.

Local 165 did not formally admit that Article 21, the CBA's grievance procedure, permitted the union the sole power to grieve live warning notices at the time of termination. *Id.* at 352-386. However, after Tracey raised the issue in her opposition (*id.* at 389:1-24, 409:24-413:24), Local 165 never disputed (*id.* at 418-439) that that the Article 21.02 "Time Limit for Filing Grievance" term of the CBA expressly provides that the "the Union shall have the right to grieve live warning notices at the time of subsequent discharge or suspension." *See* 5-LALL-ER-864-865. Local 165 argued only that "*in practice*, Local 165 does not require that The Cromwell comply with th[ese] CBA provision[s]" and does not

exercise the union's right to grieve live discipline at termination "because it only files grievances concerning discipline when the affected employee raises an issue through the filing of a grievance form." *See* 3-LALL-ER-360:3-7 (emphasis added); 1-LALL-ER-84:12-18; 3-LALL-ER-444.

According to Local 165, it "has this policy to allow it to control its grievance case load." *Id.* at 361:4-28. Local 165 noted that the employee "[s]ubmitting a grievance form is simple. The employee goes to Local 165's office and receives a copy of the one-page form," fills the form our and gives it to the front desk employee. *Id.* Local 165 acknowledged that only the union has the power to "file[] a grievance with The Cromwell," that the union "does not file grievances with The Cromwell when it is clear from the face of the grievance form that the grievance has no merit," and that the "Board of Adjustment" is "a grievance meeting between Local 165 and The Cromwell." *Id.*

These admissions make very clear that "under the terms the grievants [cannot] utilize the contractual remedy process without the help or approval of the union." *See Carr*, 904 F.2d at 1319-1320. As such, the CBA at issue here is like the CBA in *Vaca v. Sipes*, "where the union has assumed sole responsibility of preparing and presenting the

grievant's claim" under the terms of the CBA. *Id.* The fact that Local 165 has supposedly establish some unwritten policy to file grievances only when an employee comes to them and asks them to, does not alter the analysis of the exception, which is based on the CBA "terms." *Id.*

Local 165 is solely responsible for deciding what to grieve, and whether to invoke the grievance procedure. Local 165 has the sole power to grieve live discipline at the time of termination. *See* 5-LALL-ER-864-865. Mr. Contorelli testified on behalf of Local 165 that "[i]n the contract, it says you can" "grieve…any live discipline at termination." *See* 3-LALL-ER-453. Contorelli insisted that "[n]obody else that I know has – has ever don it, and I – but it is in the contract." *Id.* Contorelli acknowledged that, after he was notified of Tracey's live disciplines in advance of the grievance meeting regarding her progressive discipline termination that he could have grieved any of the live discipline, that "Best practice is we just don't do that." *Id.* Contorelli had no explanation for why it was a best practice not to grieve live discipline after an employee requests that Local 165 grieve their progressive discipline termination. *Id.*

When pressed about why he choose not to grieve any of the other live disciplines, the invalidity of which could have resulted in Tracey's

reinstatement, Contorelli asserted that "Tracey never asked us to grieve any of those former live disciplines, and I was there to fight her cause on *the cash variances*." *Id.* at 454(emphasis added). Contorelli was then asked whether he could have disputed the factual basis of the other cash variances besides the December 18, 2019 variance, and his response was "Maybe I could." *Id.* at 455. Local 165, however, did not dispute that it did not, in fact, grieve any of those other live cash variance disciplines despite having the sole power to do so under the CBA after Tracey requested the union grieve the progressive discipline termination. *Id.*

Contorelli also testified that his "duties of representation" that he owes to Local 165 members include: (1) "to investigate all claims of wrongdoing by the company;" (2) to defend grievance matters; (3) to enforce the contract; and (3) to treat members fairly. *Id.* at 445. Contorelli also testified that it was his, rather than Tracey's, duty to "decide what to grieve when she's been terminated." *Id.* at 454. Contorelli testified that despite the CBA making clear that it is the union's responsibility to file the grievance and decide what to grieve, in practice "if the employee gets a discipline, and they come down and file a grievance, I send out that grievance letter to the company." *Id.* This testimony supported the

documentary evidence that Local 165 is not reviewing matters and deciding what to grieve, instead having the employee do that function and simply forwarding the grievance form filled out by the employee without assistance to the employer with a "grievance letter." *Id.*

When investigating a discipline for cash variance, Contorelli testified that he would normally "ask for cashiering spreadsheets, for cash variances, auditing documents" and is permitted to obtain "cash register tapes." *Id.* 445, 448. However, when Contorelli was asked about specific documents relevant to variance discipline he actually requested for Tracey's discipline, he repeatedly acknowledged that he never requested nor reviewed any of these normally requested documents:

> Q Did you request the cash register tapes to cross-reference the amounts for the days that she was disciplined?
> *A I did not, sir.*
> Q Why not?
> *A I'm not sure.*

*Id.* at 455 (emphasis added).

> Q Is that the InfoGenesis card?
> A Yes, sir.
> Q Did you request the InfoGenesis records?
> *A No, sir.*
> ...
> Q Okay. Wouldn't the InfoGenesis records that track transactions be able to track whether or not -- whether

or not she had -- somebody had used it and overdrafted on her InfoGenesis account?

…

THE WITNESS:· *It might have*, but ultimately the responsibility is on the onus of the -- of the person with the card. That card is like your wallet.

…

Q Okay. But did you confirm -- did you try to confirm at all whether or not somebody did actually use her card? *A I did not, sir.*

*Id.* at 458 (emphasis added).

Q Okay. Do you recall whether or not these [due back forms] documents were produced signed or unsigned? A I'm not -- I don't believe they were signed. Q Okay. Did you request the signed copies? *A No, I did not.* Q Why not? A Because a lot of things go unsigned. These are just documents.

…

Q Okay. And you never requested the signed copies?

…

THE WITNESS:· *I did not, sir.*

*Id.* at 462 (emphasis added).

Contorelli was asked over and over about whether he requested and reviewed the documents he previously acknowledged as relevant to cash variance discipline when handling Tracey's termination grievance, and he consistently responded that he did not request or review the relevant documents. *Id. see also* 463-464. As the questioning went on, Contorelli

64

testified that he did not request the relevant documents because "We never got that far" in the investigation. *Id.* at 452, 462, 464, 467. The witness was then presented with Local 165's grievance cancelation letter dated October 9, 2020. *Id.* at 478; *see also* 5-LALL-ER-908. After Contorelli testified about about all the things he and Local 165 didn't do to investigate Tracey's termination, he was asked if he had investigated the basis for the termination at all and his response was clear, and unequivocal: "I had not, not at that time." *Id.*

## IV. THE DISTRICT COURT CLEARLY ERRED WHEN GRANTING SUMMARY JUDGMENT ON THE §301 CLAIM BECAUSE THERE WAS SUBSTANTIAL EVIDENCE THAT THE CROMWELL BREACHED THE CBA WHEN DISCIPLINING TRACEY.

When a court disregards expert "scientific analysis, weigh[s] the evidence on record, and demand[s] corroboration," it engages in "factfinding steps that exceed the court's gatekeeping role." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022). There was substantial evidence presented to the District Court that Local 165 had not investigated the cash variance discipline at all from the date the grievance was filed to the date the grievance was canceled. Local 165 also arbitrarily chose not to grieve Tracey's prior variance disciplines despite sole power to do so

after she asked the union to grieve her termination, and did not enforce the CBA provisions regarding notice and production of documents relevant to Tracey's discipline in breach of the DFR. The District Court failed to look at this evidence in the light most favorable to Tracey when granting summary judgment. A jury could find that a union's decision to not enforce CBA provisions, and not to grieve all live disciplines when a member is terminated for progressive discipline after the member asks the union to grieve a progressive discipline termination is arbitrary conduct in handling the grievance. There was a disputed issue of fact regarding whether a minimal investigation into Tracey's termination occurred because Local 165's 30(b)(6) witness testified that he had not investigated the cash variance terminations at the time the grievance was canceled. *Id.*

Further, nothing in the CBA states that a union member must attend a mediation or arbitration. *Id.* at 865-867. In fact, Local 165 acknowledged that it is an unwritten "policy…that it does not arbitrate employees' termination unless they will attend the hearing." *See* 3-LALL-ER-378. This Local 165 policy is outside the contractual grievance and arbitration procedure. *Id.* An employee cannot know that they are

required to do an act as part of exhaustion of remedies if they have no notice of it. *Id.* The one case Local 165 cited for this position was *Jay v. Serv. Emps. Int'l Union-United Health Care Workers W.*, Case No. 16-cv-01340-EMC, 2017 WL 697110 at *2-4 (N.D. Cal. Feb. 22, 2017), where a court ruled in favor of the union "because plaintiff said "she did not wish to proceed to arbitration" because she believed it was futile. Here, Tracey "would not agree" to "attend the hearing" without presence of counsel, she did not tell Local 165 not to proceed to arbitration, which is why arbitration had already been scheduled. *See* 3-LALL-ER-378:1-20.

The District Court did not address the provision of the CBA that allowed the union to grieve the live discipline at termination, instead ruling that because Tracey did not request separate grievances be filed for each of the individual disciplines when they occurred, any claims relating to those matters were time barred. *See* 1-LALL-ER-084-86. The District Court found the *Jay* case persuasive on the exhaustion requirement, holding that "the evidence shows that she would not participate without an attorney" and that her refusal to attend the hearing was akin to telling the union she did not want the matter arbitrated. *Id.* at 088.

The District Court also found that the Cromwell did not breach the CBA, ignoring both the warning notice and document production provisions of the CBA that both parties acknowledged the Cromwell was not following. *Id.* at 089-90. The Court then found that Tracey had not presented any evidence that the Cromwell breached the CBA when terminating her for the cash discipline on December 18, 2019 because "[w]hile Lall disputes the signature on two of the due back forms, what she doesn't dispute is that she received the due back amounts." *Id.*

The District Court's conclusion in this regard is clear error. Tracey did, in fact, dispute that received the due back amounts. *See* 4-LALL-ER-841. Tracey expressly alleged in the FAC that she did not have the $67 cash variance that resulted in her termination. *See* 2-LALL-ER-103:13-18. Tracey was asked at her deposition whether she had signed for a $68 due back on December 15th, 2019, and she testified clearly and credibly, "No, sir." *See* 4-LALL-ER-841. Under the Cromwell due back policy, to receive a cash due back an employee, their manager, and a cage employee are all required to sign two cage due forms that are generated to record the transaction before an employee can receive any cash due back. *See* 3-LALL-ER-579, 581, 583, 584. Tracey expressly alleged she did not have

a variance on December 15, 2019. *See* 2-LALL-ER-103:13-18. Tracey denied every signing to receive a cage due back on December 15, 2019. *See* 4-LALL-ER-841.

It was undisputed that cash due backs never issued unless an employee signs for the due back. *See* 2-LALL-ER-210. Local 165 argued that for an employee to get a due they must "file a 'due back' form to replenish the thousand-dollar bank," as did Cromwell. *See* 2-LALL-ER-210:17-23, 340:18-20. Tracey presented a forensic expert report that confirmed that Tracey did not sign the due back forms credited to her by the Cromwell. *See* 4-LALL-ER-616-643. The District Court acknowledged the forensic evidence. *Id.* The Cromwell employees handling Tracey's discipline did not have the signed due back forms. *See* 5-LALL-ER-909-912; 3-LALL-ER-463, 509. Contorelli did not have the signed due back forms. *Id.* William Davis, the manager that supposedly approved the due back, did not sign the due back form and did not witness Tracey sign for the due back in accordance with the Cromwell due back policy. *See* 5-LALL-ER-546, 550-553; *see also* 3-LALL-ER-579, 581, 583, 584. The District Court's erroneous conclusion of fact that Tracey did not deny that she received the funds warrants reversal of summary judgment.

## CONCLUSION

Appellant respectfully requests that this Court GRANT her appeal, reverse the District Court's grant of summary judgment on the discrimination and LMRA claims and remand the matter for trial.

DATED this 15th day of September 2023.

s/ Michael J. Mcavoyamaya_____
MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
*Attorney for Appellant*

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 23-15489

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is 13,879 words or ☐ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is ☐ words or ☐ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is ☐ words or ☐ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated ☐
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is ☐ words or ☐ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is ☐ words or ☐ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is ☐ words or ☐ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is ☐ words or ☐ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant: s/ Michael J. Mcavoyamaya, Esq.   Date: Sep 15, 2023

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

9th Circuit Case Number(s) | 23-15489

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | Sep 15, 2023 |.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Michael J. Mcavoyamaya, Esq.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | |.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

All participants in this case are CM/ECF users.

Signature (use "s/" format) |